# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

GATHER WORKSPACES LLC,                          :
                                                :
      Plaintiff,                               :          Civil Action No.:       19-2669 (RC)
                                                :
      v.                                       :          Re Document No.:      15
                                                :
THE GATHERING SPOT, LLC,                        :
THE GATHERING SPOT DC, LLC,                     :
THE GATHERING SPOT HOLDINGS, LLC,   :
THE GATHERING SPOT PROPERTIES, LLC :
                                                :
      Defendants.                              :

## <u>MEMORANDUM OPINION</u>

## GRANTING DEFENDANTS' ALTERNATIVE MOTION FOR TRANSFER TO THE

## NORTHERN DISTRICT OF GEORGIA

## I. INTRODUCTION

This action arises out of the Plaintiff's allegations against the Defendants for trademark infringement. The Plaintiff, Gather Workspaces LLC, is a Virginia limited liability company headquartered in Richmond, Virginia that holds a federal trademark registration for the word GATHER. The Plaintiff alleges that Defendants, The Gathering Spot, LLC, the Gathering Spot DC, LLC, the Gathering Spot Holdings, LLC, and the Gathering Spot Properties, LLC, a collection of Georgia limited liability companies, have unlawfully infringed on its mark. The Plaintiff claims that this Court has jurisdiction over the Defendants pursuant to § 28 U.S.C. 1331 and D.C. Code § 13-423(a)(1), (3), and (4) of the District's long-arm statute. The Defendants move to dismiss the Plaintiff's claims under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, and in the alternative, for transfer to the Northern District of Georgia under 28 U.S.C. § 1404(a).

After examining the Plaintiff's allegations regarding the Defendants' contacts with the District of Columbia, the Court finds that it does not have personal jurisdiction over the Defendants.  For the reasons listed below, and in the interest of justice, this action is transferred to the United States District Court for the Northern District of Georgia.

## II.  FACTUAL BACKGROUND

Gather Workspaces ("Plaintiff") is a Richmond, Virginia headquartered limited liability company that offers "co-working facilities equipped with office equipment" for members to share collaborative work space, have business meetings, and attend professional networking and socializing events.  Compl. ¶ 7, ECF 1.  Plaintiff opened its first location in Richmond, Virginia on April 1, 2014 and has since expanded to operate co-working spaces in Newport News and Norfolk, Virginia, with continued expansion to nearby metropolitan areas planned.  *Id*.; Decl. of James Crenshaw ("Crenshaw Decl.") ¶ 6, ECF 12-1.  As of the time of briefing in this case, 21 of Plaintiff's current members either "commut[e] between the greater Washington D.C. area or work[ ] for companies with headquarters or branches in the greater Washington D.C. area."  Crenshaw Decl. ¶ 8.  On March 25, 2015, Plaintiff received a federal trademark registration for the word "GATHER" as used with its above referenced associated services, under federal trademark registration number 4,707,630.  Compl. ¶¶ 7, 15; *see also* Compl. Exhibit A ("Registration Certification"), ECF 1-1.

The Gathering Spot, LLC, the Gathering Spot DC, LLC, the Gathering Spot Holdings, LLC, and the Gathering Spot Properties, LLC (collectively, "Defendants") are Georgia limited liability companies that currently operate a "members-only, private social club" called the Gathering Spot in midtown Atlanta.  Aff. of Ryan Wilson ("Wilson Aff.") ¶ 3, ECF 11-1.  The Gathering Spot has been in operation since January 30, 2016 and offers amenities to its members

that include collaborative workspaces and the opportunity to participate in its professional, charitable, and social events. *Id.* ¶¶ 3–4; *see also* Compl. ¶ 17. Defendants obtained two federal trademarks for the term "THE GATHERING SPOT," under registration nos. 5,053,536 and 5,123,588, on October 4, 2016 and January 17, 2017 respectively—roughly 18 and 21 months after the Plaintiff was awarded its trademark for the word "GATHER." Compl. ¶¶ 7, 29; *see also* Compl. Exhibit I and Exhibit J, ECF 1-14, 1-15.

Following the success of Defendants' Atlanta based club, they began to plan expansions into other markets, most notably, Washington D.C. *See* Wilson Aff. ¶¶ 4–5 (indicating that as of November 15, 2019, Defendants "expect[ed] to open a second [ ] location in the District of Columbia ("D.C.") in May of 2020."). In preparation for their debut in the D.C. market, Defendants took a number of steps. In 2018, Defendants began advertising their new D.C. location on their website. Compl. ¶ 25, Exhibit G ("Defs.' Website Screenshot"), ECF 1-12. The webpage announced, in all caps, "Coming Soon" "Washington DC's New Place to Gather"; and included a link to "Request a Membership Invitation." Defs.' Website Screenshot at 1–3. Also listed on the website under "Contact Information" was a Washington D.C. area code phone number, along with a general company email account (info@thegatheringspot.club). *Id.* at 4. Defendants also secured an Instagram account under the handle, @DCGathers, to match the @GathersATL account dedicated to their Atlanta-based club. Compl. ¶ 23; Exhibit E ("@DCGathers Screenshot"), ECF 1-10. Mirroring Defendants' website, the @GathersDC account included a link to "Request an Invitation to Become a Founding Member." *See* @DCGathers Screenshot at 2. Around this same time, Defendants placed a job listing on LinkedIn seeking a "rockstar Membership Director to build the inaugural membership base" for their forthcoming club in Washington D.C. Compl. Ex. H ("LinkedIn Job Posting") at 1, ECF 1-

13.  The Plaintiff also notes that in March of 2018, the two founders of the Defendant companies "participated in an interview on [local news station] WUSA" during which they "advertised memberships."  Compl. ¶ 27.

While not disputing the above facts, Defendants filed an affidavit to "provide important factual details and context" concerning these alleged Washington D.C. contacts.  Defs.' Mot. to Dismiss ("Defs.' Mot.") at 4, ECF 11.  Defendants note that they "had not accepted a single member in D.C. as of September 5, 2019," the date the complaint was filed, and "would not accept a member in D.C. until October [of 2019]," a month after the filing of the complaint. Wilson Aff. ¶ 8.  They concede that as of the date the complaint was filed, they "had signed a lease and engaged contractors to begin construction on a facility" in Washington D.C., but the facility was not slated to open for "at least another eight months" and they had "never used the trademark at issue" in relation to these activities.  *Id.* ¶ 12.

Defendants also attest to the fact that while they posted the job advertisement, they never filled the position, and at the time the complaint was filed they "hadn't done any advertising directed at D.C., and hadn't received any revenue from any source in D.C." *Id.* ¶ 7.  They also strenuously object to any supposed significance of the Washington D.C. area code phone number listed on their website under "Contact Information," noting that the number in question was provided because it is the personal phone number of one of the founders of the defendant companies, who has had a "202" Washington D.C. area code phone number since his time attending school at Georgetown University in D.C.  *See id.* ¶ 9.

Turning to the Instagram account, Defendants argue that the @GathersDC Instagram account was "never used . . . for any purpose" and "retained for future use." [1]  Defendants' Reply Br. ("Defs.' Reply"), Appendix A at 8, ECF 13.  They also sought to clarify that the local news appearance made by their founders was a result of the station "specifically reach[ing] out" to request that they appear in the profile, given that both had attended school in the D.C. area. Wilson Aff. ¶ 14.

On February 20, 2019, Plaintiff's counsel sent Defendants a cease and desist letter notifying them that they "consider your use of 'The Gathering Spot' an infringement of [the plaintiff's] Mark registration."  Compl. ¶ 34; *see also* Exhibit K at 2, ECF 1-16.  Defendants did not respond.  This lawsuit, which asserts three claims for violations of the Lanham Act, followed.

Count One is a claim for trademark infringement in violation of the Lanham Act § 32(1) for Defendants' use of "THE GATHERING SPOT" mark "in a manner likely to cause confusion . . . by virtue of the senior rights belonging to [Plaintiff] in the Gather Mark."  Compl. ¶ 33. Count Two asserts a trade dress infringement of the Lanham Act under § 43(a) for Defendants' use of the Gather Trade Dress in connection with their various collaborative workplace services. *Id.* ¶¶ 41–44.  Lastly, Count Three is a claim for cybersquatting under § 43(d) of the Lanham Act for Defendants' use of various web domains "with a bad-faith intent to profit from the Gather Mark."  *Id.* ¶¶ 45–47.  Plaintiff alleges that jurisdiction over the Defendants is appropriate in this

---

[1] This claim by Defendants is contradicted by the screenshot of the @DCGathers Instagram account, attached to the Complaint at Exhibit H.  *See* @DCGathers Screenshot at 2.  It shows the account had posted fifteen times (though because the account is private the content of these posts is not visible).  *Id.*  In addition, while Defendants claim that the account "had zero followers," this assertion is directly contradicted by the screenshot, which lists the account as having twenty-seven *followers*, and rather zero accounts that the account itself was *following*. *Id.*

Court because Defendants have "infringed the Gather Mark in the District of Columbia through persistent business conduct in the District of Columbia." *Id.* ¶ 5.  Defendants ask that this Court dismiss Plaintiff's complaint pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, and in the alternative, for transfer to the Northern District of Georgia under 28 U.S.C. § 1404(a).  Defs.' Mot. at 1.

### III.  LEGAL STANDARDS

#### A.  Rule 12(b)(2) Motion to Dismiss

The Defendants assert that they are not subject to personal jurisdiction[2] in the District of Columbia and therefore the complaint should be dismissed under Rule 12(b)(2) of the Federal Rules of Civil Procedure.  Plaintiff bears the burden of establishing that this Court has personal jurisdiction over the Defendants.  *See FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087, 1091 (D.C. Cir. 2008).  To meet this burden, Plaintiff is responsible for alleging specific facts "connecting [each] defendant with the forum."  *First Chicago Int'l v. United Exch. Co.*, 836 F.2d 1375, 1378 (D.C. Cir. 1988) (internal quotation omitted).  While factual discrepancies in the record must be resolved in favor of the plaintiff, *see Livnat v. Palestinian Auth.*, 851 F.3d 45, 57 (D.C. Cir. 2017), a court is not required to accept as true the plaintiff's "conclusory statements" or "bare allegations" regarding the defendants' actions when conducting the personal jurisdiction analysis.  *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1349 (D.C. Cir. 2000).

---

[2] Plaintiff has wisely chosen not to attempt to establish general personal jurisdiction over Defendants in this case, alleging only that specific personal jurisdiction exists under the relevant provisions of the District of Columbia's long-arm statute.  *See* Compl. ¶ 5.  Courts located where a corporate defendant is considered "at home," *i.e.*, where they have their principal place of business or are domiciled, are granted general jurisdiction over any claim brought against them. *See Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014).  Under this framework, Defendants, all of which are Georgia-based limited liability companies, cannot be considered "at home" as required for the purposes of general personal jurisdiction in the District of Columbia.  Accordingly, the Court's attention will focus solely on the specific personal jurisdiction analysis.

The court may instead "receive and weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts." *United States v. Philip Morris, Inc*., 116 F. Supp. 2d 116, 120 n.4 (D.D.C. 2000) (citation omitted).

## B.  The District of Columbia Long Arm Statute

 In the District of Columbia, "[t]o establish personal jurisdiction over a non-resident, a court must engage in a two-part inquiry: [a] court must first examine whether jurisdiction is applicable under the state's long-arm statute and then determine whether a finding of jurisdiction satisfies the constitutional requirements of due process." *GTE New Media*, 199 F.3d at 1347. The District of Columbia's long-arm statute provides, in relevant part, that a District of Columbia court has personal jurisdiction over a person or entity as to any claim for relief arising from the person:

> (1) transacting any business in the District of Columbia; . . . (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia; (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia.

D.C. Code Ann. § 13-423(a) (2001).

Subsection (b) of the statute further qualifies the application of jurisdiction over a non-resident defendant to only those "claim[s] for relief arising from acts enumerated in this section," *id.* § 13-423(b), thus requiring the minimum contacts that form the basis for a plaintiff's jurisdictional allegations to originate from the same acts giving rise to the claims asserted in their complaint. *See Willis v. Willis,* 655 F.2d 1333, 1336 (D.C. Cir. 1981); *Toumazou v. Turkish Republic of N. Cyprus*, 71 F. Supp. 3d 7, 15 (D.D.C. 2014).

Turning to the due process inquiry, a plaintiff must then show the existence of "minimum contacts" between the defendant and forum to a sufficient degree that "the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *GTE New Media*, 199 F.3d at 1347 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  This requires that the "defendant's contacts with the forum are of such a quality and nature that they manifest a deliberate and voluntary association with the forum" and are not merely "fortuitous." *Mouzavires v. Baxter*, 434 A.2d 988, 995 (D.C. 1981).   This ensures that "the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there."  *GTE New Media Servs. Inc.*, 199 F.3d at 1347 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

## IV.  ANALYSIS

### A.  Personal Jurisdiction

Applying the District's long-arm statute, Defendants claim that § 13-423(a)(1), (3), and (4) do not authorize personal jurisdiction over Defendants.  The Court will first address the issue of whether post-complaint evidence can be considered as part of the personal jurisdiction determination, and then will address each of Defendants' claims under the District's long-arm statute in the order in which they were raised.

#### 1.  Post-Complaint Contacts

As a preliminary matter, the parties dispute if Plaintiff can rely on evidence of Defendants' contacts with the District that arose *after* the filing of Plaintiff's complaint on September 5, 2019 to support their personal jurisdiction claims.  Plaintiff's claims are focused on Defendants' actions taken in advance of their plans to open a co-working space in D.C., *see* Pl.'s Opp'n Br. ("Pl.'s Opp'n.") at 8, ECF 12, which was still months away from opening at the time

the complaint was filed.  And while Defendants admit that they began accepting members to

their D.C. location prior to their official opening (and with it, presumably generated revenue

from these transactions), they did not do so until October 2019, a month after the complaint was

filed.  *See* Defs.' Mot. at 4.  Unsurprisingly, Plaintiff insists that this post-complaint conduct by

Defendants should be considered as part of the jurisdictional analysis.  *See* Pl.'s Opp'n. at 8–10

(arguing that "it makes no sense for the court to disregard th[e] salient fact" that following the

filing of the complaint Defendants acquired paying customers in the District).  Defendants, again

unsurprisingly, are equally adamant that this evidence—which is among the most compelling

contacts identified by Plaintiff—cannot be considered.  *See* Defs.' Mot. at 7 ("Personal

jurisdiction is determined at the time a lawsuit is filed.").

      While neither party included the applicable authority in their briefs, it is the law of this

Circuit that post-complaint contacts are not relevant to the personal jurisdiction analysis.  *See*

*McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1301 (D.C. Cir. 1996) (finding that a

Washington Post article that appeared *after* the filing of the complaint provided "no basis for

personal jurisdiction"); *see also Brunson v. Kalil & Co.*, 404 F. Supp. 2d 221, 236 (D.D.C. 2005)

(refusing to find personal jurisdiction based on a voicemail message "made well after" the

plaintiff had filed her complaint).  As Defendants note, *see* Defs.' Reply at 4–5, this rule enjoys

widespread acceptance among out-of-Circuit authorities as well.  *See, e.g.*, *Klinghoffer v. S.N.C.*

*Achille Lauro*, 937 F.2d 44, 52 (2d Cir. 1991) (explaining that "personal jurisdiction depends on

the defendant's contacts with the forum state *at the time the lawsuit was filed*") (emphasis

added); *Asarco, Inc. v. Glenara, Ltd.*, 912 F.2d 784, 787 n.1 (5th Cir. 1990) (noting that the

"relevant time for determining jurisdiction is the filing of the complaint"); *see also* 4 Wright &

Miller, Federal Practice & Procedure § 1051 at 161–62 (detailing how the filing of a lawsuit

marks the point in time in which a court considers "whether personal jurisdiction, diversity jurisdiction, and proper venue exist").

The underlying logic behind this rule demonstrates why post-complaint contacts must be excluded. As previously discussed, the minimum contacts test for personal jurisdiction is founded on the Due Process Clause, which requires a defendant to have "fair warning that a particular activity may subject them to the jurisdiction of a foreign sovereign." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (citations and alterations omitted). Pre-suit contacts by a defendant where they have purposefully directed activities at the forum in question (and where the litigation arises from or relates to those activities) serves as an appropriate "fair warning" that they may be haled into court in the forum state. *See id.* But a reliance on post-suit activities by a defendant means there would be no fair warning at all—after all, "post-suit activities cannot serve to warn the defendant of an event that has already occurred," and "by definition" cannot demonstrate a defendant's amenability to being haled into court in the specific forum. *United Phosphorus, Ltd. v. Angus Chem. Co*., 43 F. Supp. 2d 904, 908 (N.D. Ill. 1999). Thus, allowing post-complaint contacts to factor into the specific jurisdiction determination would violate due process.

The single case cited by Plaintiff that supports considering post-complaint contacts in the jurisdictional analysis would run roughshod over the fair warning requirement. In *Katzman*, the New Jersey district court observed that "[t]o permit the filing of a complaint to limit jurisdiction by immunizing a defendant's future actions in the forum state when those actions are a mere continuation of those underlying the complaint would make no sense." *Educ. Testing Serv. v. Katzman*, 631 F. Supp. 550, 556 (D.N.J. 1986). This Court agrees with Defendants, who correctly identified that *Katzman* appears to be the "sole outlier" on the issue, *see* Defs.' Reply at

4, and regardless is directly opposed by this Circuit's precedent.[3]  Accordingly, this Court will

only consider those acts that had occurred by September 5, 2019 in its jurisdictional analysis and

will exclude from consideration any contacts that occurred after Plaintiff filed its complaint.

### 2.  D.C. § 13-423(a)(1)

Turning to the provisions of the District's long-arm statute, Defendants first argue that

jurisdiction is not proper under D.C. Code § 13-423(a)(1), asserting that "[s]erious questions

exist as to [Defendants'] contacts with D.C."  Defs.' Mot. at 6.  To establish personal jurisdiction

under D.C. Code § 13-423(a)(1), a plaintiff must prove "[1] that the defendant transacted

business in the District, [2] the claim arose from that business, and [3] the business constituted

minimum contacts with the District such that the Court's exercise of personal jurisdiction would

not offend 'traditional notions of fair play and substantial justice.'" *Thompson Hine LLP v.*

*Smoking Everywhere Inc.*, 840 F. Supp. 2d 138, 142 (D.D.C. 2012).  The "transacting any

business" clause of this statute has generally been interpreted "to be coextensive with the

Constitution's due process requirements" and thus the statutory and constitutional prongs of the

statute typically merge into a single inquiry.  *GTE New Media*, 199 F.3d at 1347.  The Court will

now examine in turn each of Defendants' alleged contacts with the District that could confer

jurisdiction under § 13-423(a)(1).

### a.  Defendants' D.C. Contracts

Defendants admit that at the time the complaint was filed, they "had signed a lease and

engaged contractors to begin construction on a facility" in Washington D.C.  Defs.' Mot. at 6.

---

[3] Indeed, *Katzman* does not appear to be followed even by its sister courts in the District of New Jersey.  *See, e.g., A.S.T., LLC v. Carvin Pallenberg*, 2008 WL 2074010, at *3 (D.N.J. 2008) ("[P]ersonal jurisdiction depends on the defendant's contacts with the state *at the time the lawsuit was filed*.") (emphasis added).

Personal jurisdiction over a non-resident defendant is proper under both the long-arm statute and due process when a defendant has "enter[ed] into a contract that has a 'substantial connection' with the forum." *Helmer v. Doletskaya*, 393 F.3d 201, 205 (D.C. Cir. 2004). Courts have determined a "substantial connection" can be established in a number of ways, including when (1) "the non-resident solicited the business relationship," *Overseas Partners, Inc. v. PROGEN Musavirlik ve Yonetim Hizmetleri, Ltd. Sikerti*, 15 F. Supp. 2d 47, 51 (D.D.C. 1998); and (2) when the contract in question is at least "partly performed in the District." *Abramson v. Wallace*, 706 F. Supp. 1, 2 (D.D.C. 1989). Such a "substantial connection" is present here, given that the non-resident Defendants solicited the lease and construction contract as they sought to expand their business into the D.C. market, Defs.' Mot. at 6, and both contracts were performed in the District, where the property is located.

However, Section 13-423(a)(1) confers only specific jurisdiction and is limited to this purpose by Section 13-423(b), which prohibits the bringing of claims that do not relate to the acts that form the basis for personal jurisdiction. *See Willis*, 655 F.2d at 1336. This means that to establish personal jurisdiction under the statute, a plaintiff must not only show "[1] that the defendant transacted business in the District" but also that "[2] the claim arose from that business." *Thompson Hine*, 840 F. Supp. 2d at 142. Plaintiff fails at step two and is unable to allege that the trademark infringement claims at issue in this action arose from Defendants' D.C. lease and construction contracts.

The Plaintiff does not dispute that to confer jurisdiction, the business activity alleged under this section of D.C.'s long arm statute must be "tied directly" to its allegations of trademark injury. Pl.'s Opp'n at 7. But Plaintiff fails to allege that Defendants' facility lease and construction contract in the District caused any infringement of Plaintiff's mark. Indeed,

Defendants submit that the D.C. facility that was the object of the lease and construction contracts "never used the trademark at issue."  Wilson Aff. ¶ 12.  Plaintiff does not dispute this fact.  Because Plaintiff's trademark claims do not arise from this business activity, § 12-423(a)(1) cannot confer jurisdiction over Defendants on this basis.

### b.  Membership Solicitation Through the Defendants' Website

Plaintiff asserts that Defendants' webpage announcing their forthcoming D.C. location served as an "active solicitation of prospective Washington D.C. area customers" sufficient to subject Defendants to personal jurisdiction in the District.  Pl.'s Opp'n. at 4.  In response, Defendants seem to argue that their website activity does not constitute an advertisement or solicitation to District residents at all.  *See* Defs.' Reply at 3 ("[Defendant] still has not advertised. . . any coworking space in the District of Columbia.").  While the extent to which virtual contacts between a defendant and a forum can constitute minimum contacts for the purposes of personal jurisdiction remains an area of developing law, *see, e.g., Walden v. Fiore*, 571 U.S. 277, 290 n.9 (2014) ("leav[ing] questions about virtual contacts for another day"), contrary to Defendants' assertions, in certain circumstances it is possible for personal jurisdiction to be established in this manner.

It is undisputed in this Circuit that a defendant's extensive advertising activity, when directly targeted at D.C. residents, can subject it to jurisdiction in the District.  *See Shoppers Food Warehouse v. Moreno*, 746 A.2d 320, 330–37 (D.C. 2000) (finding "extensive and substantial" weekly advertisements targeted to D.C. customers through placement in the Washington Post to constitute minimum contacts).  However, it is also clear that the "mere accessibility of [a] defendant['s] website" to D.C. residents is *not* sufficient to establish the necessary minimum contacts for personal jurisdiction.  *GTE New Media,* 199 F.3d at 1349–50;

*Hayes v. FM Broad. Station WET,* 930 F. Supp. 2d 145, 152 (D.D.C. 2013) (declining to find personal jurisdiction over a defendant who allegedly infringed on trademarks held by West Virginia internet radio station, when only contact was the availability of the defendant's website to D.C. residents); *Doe I v. State of Israel*, 400 F. Supp. 2d 86, 121 (D.D.C. 2005) ("A website accessible by computers in the District of Columbia, or by District of Columbia residents, is not purposeful availment; rather, it is merely an unavoidable side-effect of modern internet technology."). Thus, the question becomes just how substantial and targeted the advertising activity contained on a website must be to give rise to minimum contacts.

Courts in this Circuit have found personal jurisdiction exists due to the online website activity of a non-resident defendant when a defendant's website is highly interactive. *See 12 Percent Logistics, Inc. v. Unified Carrier Registration Plan Bd.*, 282 F. Supp. 3d 190, 201 (D.D.C. 2017) ("Whether a website provides sufficient contacts for a court to exercise jurisdiction often turns on whether the website is 'passive,' such as the mere communicator of information, or 'interactive,' such as allowing for some back-and-forth with the user."). In *Gorman*, the leading case on the topic, the D.C. Circuit found that personal jurisdiction existed where the defendant's website allowed for the "engage[ment] in real-time transactions with District of Columbia residents" that generated "binding contracts" through which the defendant obtained "valuable revenue." *Gorman v. Ameritrade Holding Corp.,* 293 F.3d 506, 512–13 (D.C. Cir. 2002). [4] A website's ability to accept online donations and facilitate the exchange of contact information is not enough to qualify as interactive, *see Doe I*, 400 F. Supp. 2d at 121, nor is a website feature that allows for "users to create personal user accounts," *Triple Up Ltd. v.*

---

[4] While *Gorman* involved general personal jurisdiction, not specific personal jurisdiction, the reasoning regarding sufficient minimum contacts to comply with due process in the context of website interactivity also applies to specific jurisdiction.

*Youku Tudou Inc.*, 235 F. Supp. 3d 15, 28 (D.D.C. 2017).  And most pertinent to the case at hand, a website may still be considered "passive" even where it "accepts registrations and fee payments." *12 Percent Logistics*, 282 F. Supp. 3d at 201.[5]

The Court is unconvinced that Defendants' website is sufficiently "interactive" to the extent that the imposition of personal jurisdiction would be proper.  While neither party explicitly addresses this argument in the briefing, the only interactivity alleged is that the website "solicit[ed] the consuming public to purchase membership for the Washington D.C. location" by providing an online registration form to "request a membership invitation" to the forthcoming club, along with listing on its webpage under "Contact Information" a phone number with a Washington D.C. 202 area code that interested parties could presumably call.[6]  Compl. ¶ 25;

---

[5] In *Heroes*, a case Plaintiff attempts to posit is directly on point, the court found that there were sufficient minimum contacts to bring a trademark infringement claim in the District arising from an advertisement in the Washington Post soliciting donations for the defendant's charity.  *See Heroes, Inc. v. Heroes Found.*, 958 F. Supp. 1, 5 (D.D.C. 1996).  The Plaintiff seeks to make much of the fact that in *Heroes*, a factor cited as supporting jurisdiction was that the defendant also had a website available to D.C. residents that "explicitly solicit[ed] contributions" with a "toll-free telephone number [available] for that purpose."  *Id.*  However, this case is unavailing for several reasons.  First, *Heroes* is almost 25 years old and was written when the courts first began to grapple with the advent of webpages and the Internet, before this technology took on its now ubiquitous role in modern life.  As detailed above, the intervening case law in the years since now holds that the mere availability of a website to forum residents is not enough to impose personal jurisdiction.  *See e.g.*, *GTE New Media,* 199 F.3d at 1349–50.  Second, the plaintiffs quickly gloss over the fact that the court in *Heroes* declined to decide whether the defendant's maintenance of a website available to D.C. residents to collect donations, without more, would be sufficient to establish minimum contacts.  *See id.* ("[B]ecause the defendant's home page is not the only contact before the Court, see above, the Court need not decide whether the defendant's home page by itself subjects the defendant to personal jurisdiction in the District.").  The other contact at issue in *Heroes*—the solicitation that appeared in the Washington Post—is the type of contact courts in this Circuit have long found to be sufficient to confer jurisdiction, and it is intentional and targeted to a wide swath of District residents in a way the contacts alleged by Plaintiff are not.

[6] Plaintiff asserts in its opposition that Defendants "used the offending trademark to solicit customers in D.C. for more than a year" including "by telephone."  Pl.'s Opp'n. at 3.  But there are no allegations in the complaint that Defendants ever actively solicited D.C. customers

Defs.' Website Screenshot at 3–4.  But, as of the time the complaint was filed, Defendants had

not accepted any new members to their future D.C. location, through either the web registration

portal or by calls to the listed phone number.  Defs.' Reply, Appendix A at 8.  This means there

was a complete absence of the necessary "real time transactions [occurring] with D.C.

residents"—with no contracts being entered or revenue generated for Defendants.  *See Gorman*,

293 F.3d at 512–13.  In short, at the time the complaint was filed, no business with D.C.

residents was being conducted on or through the website, rendering it a "passive website" and

therefore an inappropriate contact to use to support the imposition of jurisdiction.  And even if

Defendants had been accepting registrations through their website and charging a membership

fee, at least one other court in the Circuit has found this activity may still not be enough for a

website to be considered interactive for the purposes of personal jurisdiction.  *See 12 Percent*

*Logistics, Inc.*, 282 F. Supp. 3d at 201 (deeming a website "passive" even though it "accepts

registrations and fee payments").  Accordingly, personal jurisdiction cannot be conferred based

on Defendants' website.

### c.  Other Contacts

The Court is also ultimately unpersuaded that other alleged contacts between Defendants

and the District—namely Defendants' use of Instagram, their LinkedIn job posting, and a news

interview broadcast on a local D.C. television news station—are enough to show that Defendants

purposefully availed themselves of the privilege of conducting activities within the District.

First, the parties do not dispute that Defendants own a "D.C.-specific Instagram account"

under the name @DCGathers.  Pl.'s Opp'n. at 6; Defs.' Reply at 7–8.  However, while Plaintiff

---

through the much-referenced Washington D.C. area code phone number, simply that this number
was available on Defendants' website under the "Contact Information" page.

alleges that the Instagram account was "used to promote [Defendants'] services to D.C.
residents," Pl.'s Opp'n at 6, Defendants argue that this claim is false, and that they "*never* used
the Instagram account for any purpose whatsoever." Defs.' Reply, Appendix A, at 8. Regardless
of its status as a "social media" application, to determine if this Instagram account can be
considered a minimum contact for the purposes of jurisdiction, it must be evaluated under the
same interactivity criteria that governed the analysis of Defendants' website. *See e.g.,*
*Sweetgreen, Inc. v. Sweet Leaf, Inc*., 882 F. Supp. 2d 1, 5 (D.D.C. 2012) (determining that
Facebook and Twitter social media sites in question are akin to "passive websites" and are an
improper basis to impose jurisdiction); *Binion v. O'Neal*, 95 F. Supp. 3d 1055, 1060 (E.D. Mich.
2015) (deciding that posts on Instagram and Twitter were "minimally interactive" and "little
more than the posting of information on social media websites, which became accessible to users
in [the forum] and elsewhere."). While the specific substance of the fifteen @DCGathers
Instagram posts are not available to the Court at this time,[7] the account's biography section
contained a short blurb stating: "Opening Fall 2018. Request an Invitation to Become a Founding
Member" with a link to Defendants' website. Instagram Screenshot at 2. This link (presumably
to the section of Defendants' website describing the future D.C. location) is, as detailed above in
the discussion concerning Defendants' website, simply insufficient to render the Instagram
account as an interactive webpage. *See supra* Section IV.A.2.b. The factual record is clear that
at the time the complaint was filed, Defendants were not granting memberships to their future
D.C. location. Defs.' Reply, Appendix A at 8. While interested parties could visit the

---

[7] Due to the @DCGathers Instagram account being set to "private," the screenshot
included as Exhibit E to the plaintiff's complaint does not provide the content of the posts made
by the account. *See* Instagram Screenshot at 2 (noting "This Account is Private. Follow to see
their photos and videos.").

registration page on Defendants' website (including by clicking the link on their Instagram page) and apply, no memberships were being accepted—meaning there were no commercial transactions occurring between Defendants and Washington D.C. residents during the time period at issue.  As a result, even with this link to Defendants' website, the @DCGathers Instagram had "no business [being] conducted on or through [it]" rendering it a passive website. *Sweetgreen, Inc.*, 882 F. Supp. 2d at 4.  Indeed, because there were no commercial transactions with D.C. residents being conducted through *any* online medium at this time with regard to Defendants' D.C. location, even without this Court seeing the substance of the 15 @DCGathers Instagram posts, the account must necessarily have been passive at that time.  And a passive website cannot on its own provide a basis for jurisdiction.  *See id.* (declining to impose jurisdiction on the basis of passive social media pages that were "all informational in nature").  Further supporting this conclusion is the seemingly minimal reach of the account to D.C. residents even on a purely informational basis, given that the account has only a paltry twenty-seven followers and has posted only fifteen times.  *See* Instagram Screenshot at 2.  Hence, Defendants' Instagram account is not a sufficient minimum contact with the District to impose personal jurisdiction.

Next, Defendants' purported contact with the District through a job posting on LinkedIn also fails to serve as an appropriate basis for personal jurisdiction.  Sometime in 2018, the defendants listed on LinkedIn a job post searching for a "Membership Director" for their new D.C location.  *See* LinkedIn Job Posting.  While the job posting was for a position that would eventually be located in the District, it was posted on LinkedIn, a social networking website with a global audience.  Given that this job advertisement was available to anyone, anywhere with an Internet connection and LinkedIn account, the Court cannot find that D.C. residents were

specifically targeted to a degree that personal jurisdiction is proper.  *See e.g.*, *Budik v. Dartmouth-Hitchcock Med. Ctr.*, 937 F. Supp. 2d 5, 14 (D.D.C. 2013) (finding that postings for potential employees in journals with a national circulation did not specifically target D.C. residents, making personal jurisdiction on this basis improper); *see also Dearwater v. Bond Mfg. Co.*, 2007 WL 2745321, at \*4 (D. Vt. Sept. 19, 2007) (determining that defendant's job posting on Careerbuilder.com and Craigslist.com that was read by plaintiff in Vermont did not constitute "purposeful availment," given defendant was advertising nationally for a position).  Nor did Defendants ever hire anyone to fill this role at their forthcoming D.C. club.  Defs.' Mot. at 4. Indeed, as of the time the complaint was filed, Defendants did not have a single employee in the District.  *Id.*  Without more, a single job posting on the world's largest professional social networking website for a position in the District (that was never filled) is not enough to impose personal jurisdiction over the Defendants.

Finally, Plaintiff also asserts that minimum contacts exist due to a televised interview with the founders of the Defendant companies that was broadcast on local Washington D.C. CBS affiliate WUSA in March 2018.  Compl. ¶ 27; Defs.' Reply at 6.  This single television appearance, which took place more than nineteen months before the Defendants began accepting memberships to their future location in the District, is far too tenuous to confer personal jurisdiction.  No cases in this Circuit have determined that personal jurisdiction exists over a foreign defendant resulting from their alleged solicitation of customers in D.C. arising from a single televised news appearance.  *See Moreno*, 746 A.2d at 331 (finding sufficient minimum contacts where "extensive and substantial" weekly print advertisements were published in the Washington Post *in addition to* regular television advertisements that also appeared in the District); *Blumenthal v. Drudge*, 992 F. Supp. 44, 54 (D.D.C. 1998) (concluding personal

jurisdiction was proper where defendant regularly transmitted online newsletter to D.C. subscribers, solicited financial contributions from D.C. residents, was in contact with D.C. residents via email, telephone, and U.S. mail for tips for said newsletter, *and* appeared on C-SPAN interview "for [the] express purpose of promoting" the newsletter).  Defendants have also cited to an out-of-Circuit case that supports this same conclusion.  *See Madara v. Hall*, 916 F.2d 1510, 1519 (11th Cir. 1990) ("Simply giving an interview to a reporter is not enough to cause [the defendant] to anticipate being haled into court in [the forum state].").

Also informing the Court's analysis is that this television appearance was not a television advertisement specifically designed and paid for by Defendants to solicit D.C. customers for their business (which had not even begun its D.C. expansion at this point in time).  Defs.' Reply at 6.  Rather, WUSA "specifically reached out" to Defendants to ask them to appear on the show to discuss the success of their business venture in Atlanta given their personal ties to the Washington D.C. area.  Wilson Aff. ¶ 14; Defs.' Reply at 6.  This situation is thus distinguishable from other cases where jurisdiction has been found to exist based on media advertising where a party intentionally contracts with a D.C. media entity to place an advertisement that targets D.C. residents.  *See Heroes*, 958 F. Supp. 1 at 3 (reasoning that personal jurisdiction was proper where the business partner of defendant, with defendant's blessing, placed paid advertisement in the Washington Post); *Moreno*, 746 A.2d at 332 (defendant contracted with the Washington Post and local news stations to place advertisements). It follows that accepting the interview with WUSA was simply an action by Defendants to take advantage of positive publicity in a market in which they one day hoped to operate, and not "purposely directed" advertising toward the District of the quality required for personal jurisdiction to be imposed.

3.  D.C. § 13-423(a)(3)

Defendants also claim that personal jurisdiction is not proper under § 13-423(a)(3)

because Plaintiff did not suffer injury in the District of Columbia.  Defs.' Mot. at 8.  Under D.C.

Code § 13-423(a)(3), a court may exercise personal jurisdiction over a person who "caus[es]

tortious injury in the District of Columbia by an act or omission in the District of Columbia."

D.C. Code § 13-423(a)(3).  This subsection requires that "both act and injury occur in the

District of Columbia."  *Helmer v. Doletskaya*, 393 F.3d 201, 208 (D.C. Cir. 2004) ("This

provision is a precise and intentionally restricted tort section which stops short of the outer limits

of due process[] and requires that both act and injury occur in the District of Columbia.")

(internal quotation marks omitted).

Accordingly, the key question is whether Plaintiff suffered the alleged trademark injury

in the District.  There are two primary approaches to determining the location of injury in

trademark infringement cases.  First, "[s]ome courts assert that 'in cases of trade-mark

infringement and unfair competition, the wrong takes place . . . where the passing off occurs, i.e.,

where the deceived customer buys the defendant's product in the belief that he is buying the

plaintiff's.'"  *Citadel Inv. Grp., L.L.C. v. Citadel Capital Co.*, 699 F. Supp. 2d 303, 313 (D.D.C.

2010) (quoting *Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.2d 633, 639 (2d Cir. 1956), and

(collecting other cases) (alteration in original).  Plaintiff cannot assert "tortious injury in the

District of Columbia" under this theory, as memberships to Defendants' forthcoming D.C. club

were not for sale within the District (or anywhere) at the time the complaint was filed in this

action.

"Other courts [have] conclude[d] that the place of injury in a trademark case is the forum

where a plaintiff 'mainly' uses the trademarks at issue—defined alternatively as the place where

the plaintiff does the majority of its business or the state where the plaintiff's primary office is located." *Citadel,* 699 F. Supp. 2d at 313 (collecting cases).[8]  Plaintiff has also not alleged the required "tortious injury in the District of Columbia" under this theory.  Plaintiff does not allege that it does *any* business within the District, much less that it conducts "the majority" of its business within the District's boundaries.  Nor is its primary office (or any corporate office or any of its co-working locations) located within the District's borders.  Perhaps in recognition of this deficiency, Plaintiff seeks to highlight both that the company has "at least two (2) other locations" planned and that twenty-one current members of Plaintiff's coworking locations either commute from the greater Washington D.C. area or work for companies with headquarters or branches located there.  Crenshaw Dec. ¶¶ 8, 10.  Even if the Court credited these vague assertions (where are these two forthcoming locations and how does Plaintiff define "the greater Washington D.C. area?"), they do not change the fact that Plaintiff "mainly" uses its trademark in Virginia, the only state in which it operates co-working locations and where its primary office is located.  Accordingly, under the governing criteria, Plaintiff would only suffer injury in Virginia.  Because under both approaches Plaintiff cannot demonstrate that any injury occurred in Washington, D.C., this Court cannot find that personal jurisdiction is proper under § 13-423(a)(3).[9]

---

[8] This is somewhat in accord with the theory put forth by Defendants.  Though they cite only to copyright cases, they contend that "[t]he location of the injury in an intellectual property case is the residence of the intellectual property owner."  Defs.' Mot. at 8 (citing *Shaheen v. Smith*, 994 F. Supp. 2d 77, 82–83 (D.D.C. 2013) (Contreras, J.); *Nu Image, Inc. v. Does 1-23*, 322, 799 F. Supp. 2d 34, 38–39 (D.D.C. 2011)).

[9] The Court finds the alternative approach to determining injury advocated by Plaintiff unpersuasive.  Plaintiff argues that "the wrong takes place where confusion is likely to occur." Pl.'s Opp'n. at 8 (quoting *Heroes*, 958 F. Supp. at 5).  Under this theory, Plaintiff claims that it suffered injury in the District of Columbia because that is the forum where consumers would have been confused between the two competing co-working services.  *See id.*  Putting aside that on a factual basis this claim is somewhat unconvincing—given that Plaintiff does not operate any

4.  D.C. § 13-423(a)(4)

Finally, Defendants seek to refute Plaintiff's assertion of personal jurisdiction under § 13-423(a)(4) by arguing that at the time the complaint was filed, Defendants "had never solicited business or derived substantial revenue in D.C." Defs.' Mot. at 8.  The Court need not reach this dispute, as this subsection of the D.C. long-arm statute states that jurisdiction over a non-resident defendant is only proper if they have "caus[ed] tortious injury in the District of Columbia by an act or omission in the District of Columbia" where a defendant "regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia" D.C. § 13-423(a)(4). This basis for personal jurisdiction can be quickly disposed of because, as discussed *supra* at Section IV.A.3, Plaintiff has not properly alleged that Defendants caused tortious injury in the District of Columbia.  Given this fatal deficiency, the Court need not proceed any further.  For this reason, personal jurisdiction cannot be asserted over Defendants under D.C. § 13-423(a)(4).

**B.  Transfer to the Northern District of Georgia**

When jurisdiction over an action is found lacking, "the court shall, if it is in the interest of justice, transfer such action . . . to any other such court . . . in which the action or appeal could have been brought at the time it was filed." 28 U.S.C. § 1631. While the parties have raised the prospect of transfer, with Defendants requesting in the alternative that the Court transfer this case to the Northern District of Georgia, Def.'s Mot. at 9–12, district courts have the discretion to

---

coworking locations within 100 miles of the District and Defendants were not yet operating in D.C.—this approach from *Heroes* is stated only in dicta and finds no support in the relevant case law.  *See, e.g.*, *Citadel*, 699 F. Supp. 2d at 313 n.7 ("[N]o case that cites *Heroes* adopts its approach [to determining the location of trademark injury], and the Court has found no other authority supporting its approach.").

initiate transfer pursuant to 28 U.S.C. § 1631 *sua sponte*. *See Hill v. U.S. Air Force*, 795 F.2d 1067, 1070 (D.C. Cir. 1986). Indeed, the law of this Circuit suggests that when a district court lacks personal jurisdiction over a case, transfer to a court where jurisdiction is proper is preferred, and perhaps even required, to dismissing the case. *See Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 80 (D.C. Cir. 1985) (observing that "[u]nder 28 U.S.C. § 1631 (1982), where a court finds that it lacks jurisdiction, it must transfer such action to the proper court, if such transfer is in the interest of justice"); *Sinclair v. Kleindienst*, 711 F.2d 291, 293–94 (D.C. Cir. 1983) (noting the Supreme Court has found transfer particularly appropriate "when procedural obstacles," defined to include lack of personal jurisdiction, "impede an expeditious and orderly adjudication . . . on the merits.").

There are three required elements to a 28 U.S.C. § 1631 transfer: "(1) there must be a lack of jurisdiction in the district court; (2) the transfer must be in the interest of justice; and (3) the transfer can be made only to a court in which the action could have been brought at the time it was filed or noticed." *Fasolyak v. The Cradle Soc'y, Inc.*, No. 06–1126, 2007 WL 2071644, at *11 (D.D.C. July 19, 2007) (quoting *Ukiah Adventist Hosp. v. FTC*, 981 F.2d 543, 549 (D.C. Cir. 1992)).

Transfer in this case is appropriate pursuant to 28 U.S.C. § 1631, as all three of the required elements are met. First, as detailed above, the Court has concluded that it lacks jurisdiction over this action. Transfer is also in the "interest of justice" as it avoids the inefficiency of dismissing this action and requiring Plaintiff to refile it. *See, e.g., Capital Bank Int'l Ltd. v. Citigroup, Inc.*, 276 F. Supp. 2d 72, 78 (D.D.C. 2003) (concluding that transfer is in the interest of justice where it saves parties the time and expense of refiling). Finally, Plaintiff's claim could have properly been brought in the Northern District of Georgia given that personal

jurisdiction over Defendants exists and venue appears to be proper there.  Essentially all of the events giving rise to Plaintiff's claims occurred in the Northern District of Georgia, which is where Defendant companies are registered and the business that uses the trademark in dispute operates. Tellingly, Plaintiff does not dispute that this case could have been brought in the Northern District of Georgia. [10]  While this case was filed in the wrong district, the Court finds that it is in the interest of justice to transfer this action to the Northern District of Georgia.

## V.  CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the complaint for lack of personal jurisdiction, ECF No. 11, will be denied without prejudice and the case transferred to the United States District Court for the Northern District of Georgia.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  October 16, 2020                                    RUDOLPH CONTRERAS
                                                                    United States District Judge

---

[10] While Plaintiff requests that this case be transferred to the Eastern District of Virginia, Pl.'s Opp'n at 11 n.5, it does not explain how this action could have been brought in the Eastern District of Virginia in the first instance, and if a court there could exercise personal jurisdiction over Defendants.